**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LINDA HARDY, | ) | |
| | ) | CASE NO.    5:12CV1836 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Linda Hardy ("Hardy") challenges the final decision of the Commissioner of

Social Security, Michael J. Astrue ("Commissioner"), denying her claim for a Period of

Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act ("Act"), 42 U.S.C. §§ 416(i) and 423 *et seq*.  This matter is before the Court

pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28

U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is affirmed.

## I.  Procedural History

On November 23, 2004, Hardy filed an application for POD and DIB alleging a disability

onset date of March 1, 2002 and claiming she was disabled due to herniated discs, cervical

stenosis, a "possible heart condition," underactive thyroid, and arthritis. (Tr. 84-86, 137).  Her

application was denied both initially and upon reconsideration. (Tr. 53-60).  On October 16,

2007, an Administrative Law Judge ("ALJ") held a hearing during which Hardy, represented by

counsel, testified. (Tr. 1047-1075).  An impartial vocational expert ("VE") was present but did

not testify.  On June 27, 2008, the ALJ found Hardy was able to perform a significant number of

jobs in the national economy and, therefore, was not disabled.  (Tr. 13-30). The ALJ's decision

became final when the Appeals Council denied further review. (Tr. 6-8).

Hardy appealed to this Court on April 23, 2009.  *See Hardy v. Comm'r of Soc. Sec*., Case

No. 5:09CV928 (N.D. Ohio).  On March 17, 2010, the Court entered a joint Stipulation of

Remand, in which the parties agreed to the need for further administrative proceedings including

a new hearing and decision. The Stipulation noted the new hearing should include relevant VE

testimony regarding the impact of Hardy's exertional and non-exertional limitations.

The Appeals Council thereafter vacated the ALJ decision of June 27, 2008 and remanded.

(Tr. 1175-1176).  On September 13, 2011, another ALJ conducted a hearing at which Hardy,

represented by counsel, and an impartial VE testified. (Tr. 1463-1501).  On November 21, 2011,

the ALJ found Hardy was able to perform a significant number of jobs in the national economy

and, therefore, was not disabled. (Tr. 1098-1117).  The ALJ's decision became final when the

Appeals Council denied further review. (Tr. 1076-79).[1]

---

[1]      Hardy was injured in an accident after her insurance expired.  In separate proceedings, she was found to be disabled as of her 55th birthday.  She began receiving supplemental security income ("SSI") as of June 17, 2008. (Tr. 1467.)

## II.  Evidence

*Personal and Vocational Evidence*

Hardy was age 49 as of her alleged onset date of March 1, 2002 and age 53 as of her date last insured, December 31, 2006.  Thus, under social security regulations, she was a "younger person" from March 1, 2002 to July 17, 2003; and a "person closely approaching advanced age" from July 18, 2003 to December 31, 2006.  *See* 20 C.F.R. § 404.1563(c) and (d).  Hardy completed high school and obtained vocational training in nursing. (Tr. 1049-1050).  She testified to past relevant work as a nurse assistant.  (Tr.  1050, 1476).

*Medical Evidence*[2]

In May 2001, Hardy injured her back while working as a nurse assistant. (Tr. 137, 1051, 1107).  She underwent several MRIs in 2001 and 2002 which indicated disc herniations, spinal stenosis, and degenerative disc disease. (Tr. 334-35, 342).  In March 2002, Hardy presented to the emergency room ("ER") complaining of left arm tingling, pain, and headache. (Tr. 226-240).  She underwent a CT scan of the brain, which revealed cerebral atrophy and remote appearing right basal ganglia lacunar infarction, i.e. a stroke. (Tr. 237).  The following month, Hardy returned to the emergency room complaining of arm pain and numbness, shoulder and neck pain, weakness, fatigue, dizziness, headaches, and nausea. (Tr. 278).  She was admitted to the hospital and underwent another brain CT scan, which showed no intracranial hemorrhage, infarct, or lesion. (Tr. 241).

---

[2]  In addition to the physical limitations that are at issue in this case, the ALJ evaluated Hardy's mental impairments and included mental limitations in the residual functional capacity ("RFC").  As Hardy does not raise any argument regarding the RFC's mental limitations, this Opinion does not discuss the evidence regarding her mental impairments.

Meanwhile, the record reflects Hardy pursued treatment with numerous providers and visited the ER repeatedly with complaints of neck and back pain.  She was prescribed narcotic-based pain medications from multiple physicians.  Jonathan Waldbaum, M.D., treated Hardy from January 2004 through January 2006.  He diagnosed her with herniated discs and lumbosacral sprain and prescribed pain medication.  (Tr. 399).  In August 2004, he performed a lumbar epidural steroid spine block injection and prescribed a narcotic patch. (Tr. 397).  The following month, Dr. Waldbaum learned that Hardy had obtained controlled substances from multiple physicians and pharmacies, including prescriptions for Xanax and Percocet.  (Tr. 395-396).  Dr. Waldbaum thereafter refused to prescribe her opiates.  (Tr. 395, 958).  It appears Hardy then received pain medication from another physician, Robin Znidarsic, M.D.  (Tr. 425).  She also received narcotics-based pain medication as a result of her many ER visits.  (Tr. 316, 331, 474).

In October 2004, Hardy presented to Rajiv Taliwal, M.D., who assessed disc herniations as well as left shoulder impingement. (Tr. 385).  He indicated Hardy's shoulder symptoms should be addressed conservatively and recommended physical therapy.  (Tr. 385).  At a follow-up appointment a month later, Dr. Taliwal noted Hardy had only attended one physical therapy session.  (Tr. 385).

In February 2005, Walter Holbrook, M.D., conducted a records review and physical RFC evaluation.  (Tr. 413-420).  At that time, he opined Ms. Hardy could lift no more than 10 pounds occasionally, less than 10 pounds frequently, and could sit or stand/walk for six hours each per eight hour workday.  (Tr. 414).  He also determined Hardy was limited to reaching in all directions due to her left arm impingement. (Tr. 416).

4

In July 2005, Hardy was referred to the Cleveland Clinic Chronic Pain Rehabilitation Program for assessment.  Prior to admission, a physical therapist examined Hardy and found she had four out of five positive Waddell's signs.[3]  (Tr. 475, 480).  The physical therapist found that Hardy was deconditioned with chronic pain symptoms and might benefit from an interdisciplinary pain program.  (Tr. 481).  Edward Covington, M.D., concurred after his own evaluation and recommended treatment "on a daycare basis" for a three week period. (Tr. 477).

Hardy was admitted to the pain rehabilitation program on October 24, 2005.  (Tr. 602). Shortly thereafter, she presented as lethargic, confused, ataxic and hyperreflexic due to benzodiazepine and opiate detoxification and withdrawal.  (Tr. 602, 636- 638).  She was hospitalized from October 28 to October 31, 2005.  (Tr. 602, 636-638).  Hardy continued with the pain rehabilitation program after detox and received services from occupational therapists, physical therapists, and psychologists.  (Tr. 602-606).  After three weeks of treatment, Hardy had increased both her left and right grip as well as her bilateral shoulder strength.  (Tr. 565).  She was able to perform bicep curls with five pounds (15 repetitions); could leg-press 88 pounds (15 repetitions); and could speed walk at 3.2 mph. (Tr. 565).  Moreover, she "report[ed] self-care tasks without an increase in pain," including carrying 15 pounds of groceries for 200 feet up and down four sets of 15 stairs and pushing a 100 pound grocery cart for 1000 feet.  (Tr. 565).

---

[3]     "A positive Waddell's sign indicates that there exists a non-organic (i.e. psychological or psychosocial) component to an individual's lower back pain." *Huckleberry v. Comm'r of Soc. Sec.*, 2012 WL 3886431 at note 1 (E.D. Mich. Aug. 6, 2012) (citations omitted); *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 420 (6th Cir. 2008) (Waddell's signs are a clinical test for patients with low back pain that can be used to indicate whether the patient is exaggerating symptoms); *Mabra v. Comm'r of Soc. Sec.*, 2012 WL 3600127 at note 3 (S.D. Ohio Aug. 21, 2012) ("'Waddell's signs' refers to a system of identifying psychogenic or nonorganic manifestations of pain.") (citations omitted).

At the time of her discharge on November 14, 2005, Dr. Covington reported her pain level as 5/10 and a Pain Disability Index Score of 22/70, "suggesting mild functional impairment." (Tr. 606).  He noted her activity level as "unrestricted" and recommended she participate in twice-monthly outpatient aftercare treatment. (Tr. 606).  The record fails to show that Hardy followed this recommendation.

Rather, approximately two months later, Hardy presented to Dr. Waldbaum and indicated the pain rehabilitation program had been "useless." (Tr. 958).  She acknowledged she had since obtained narcotic patches and Xanax from her primary care physician. (Tr. 958).  Hardy insisted that Dr. Waldbaum prescribe her narcotic pain medication, which he refused to do.  (Tr. 958).  When Hardy refused to acknowledge her past problems with over medication, Dr. Waldbaum terminated the doctor-patient relationship.  (Tr. 958).

In February 2006, Hardy went to the ER complaining of neck and back pain.  (Tr. 682-693).  She was prescribed Skelaxin and Percocet, and discharged. (Tr. 690).  In April 2006, Hardy was hospitalized after complaining of severe left arm pain, severe headaches, and blurred vision. (Tr. 694-712).  Physical examination revealed "strikingly" increased deep tendon reflexes on the upper extremities and positive straight leg testing. (Tr. 702).  Hardy was diagnosed with cervical myelopathy. (Tr. 702).  She underwent a cervical MRI, which revealed disc herniations and a disc bulge. (Tr. 709).  She also underwent a brain MRI, which indicated prominent perivascular spaces "of questionable significance," but was otherwise normal. (Tr. 711).  She was prescribed pain medication and discharged. (Tr. 707).

In June 2006, Hardy began treatment with Sameh Yonan, M.D., at the Cleveland Clinic Pain Management Clinic at South Pointe Hospital. (Tr. 753-762).  Dr. Yonan noted good range

6

of motion in her neck with diffuse tenderness over the posterior neck muscles. (Tr. 754).  He also noted good motor function and reflexes, intact sensory function, and a "fair and good range of motion" with increased pain.  (Tr. 754).  He recommended "non-narcotic therapy," epidural steroid injections, as well as physical therapy and psychotherapy. (Tr. 754).

In September 2006, Hardy began seeing a new primary care physician, Dr. Lori Gemma. (Tr. 966-977).  She presented with complaints of constant headaches and back pain. (Tr. 976). Dr. Gemma also noted COPD and emphysema. (Tr. 976).  Hardy presented to Dr. Gemma again in December 2006, complaining of headaches and back pain.  (Tr. 970-973).  Dr. Gemma ultimately indicated she would not provide any further narcotics and advised Hardy to seek help from her pain management physician. (Tr. 971).  The record reflects Hardy presented to various ERs during late 2006, where she received narcotic pain medication. (Tr. 784-787, 818-825).

Also in 2006, Hardy underwent two brain CT scans which were reported as normal. (Tr. 801, 817).  In January 2007, Derek Krieger, M.D., Ph.D., examined Hardy and concluded there was no evidence of past or ongoing cerebrovascular disease. (Tr. 831-833).  Later that year, at the request of the ALJ, Joseph Konieczny, Ph.D., conducted a psychological evaluation of Hardy. (Tr. 984-993).  Among other things, he determined that it did not appear Hardy had suffered any long term residual intellectual deficits subsequent to a stroke. (Tr. 987).

In February 2007, Dr. Gemma completed a physical capacity evaluation. (Tr. 932-934). Dr. Gemma limited Hardy to lifting and carrying five pounds occasionally, and standing and walking for four hours per eight hour workday. (Tr. 933).  She indicated Hardy's legs would need to be elevated at chair level and that she would need additional rest periods throughout the day.  (Tr. 933-34).  She stated Hardy could occasionally kneel and crawl, but rarely or never

climb, balance, stoop, crouch, reach, push, pull, or engage in either fine or gross manipulation. (Tr. 934). Although noting Hardy had been prescribed a breathing machine, Dr. Gemma indicated she had no environmental limitations. (Tr. 934).

### Hearing Testimony

At the October 16, 2007 and September 13, 2011 hearings,[4] Hardy testified to the following:

- She lives with her adult son and minor daughter. (9/11 Hrg. Tr. 1475-1476).

- She graduated from high school and took some college courses in nursing. (10/07 Hrg. Tr. 1049-1050).

- She worked as a nursing assistant for many years until she injured her back in 2001 lifting a patient. After her back injury, she attempted working at a desk job. She was unable to work, however, because it was too painful to sit. (10/07 Hrg. Tr. 1050-1051; 9/11 Hrg. Tr. 1476-1477, 1483-1484).

- She was prescribed narcotic pain medication for her back injury and ultimately became addicted. As of the September 2011 hearing, she was still taking Percocet, but was being monitored by her physician. (9/11 Hrg. Tr. 1479).

- In the October 2007 hearing, she could stand or walk for five to ten minutes before having to sit, and could sit for five to ten minutes before having to move. She could lift five pounds and raise both her hands over her head. She could go up steps and did not use a cane or walker. Her left arm was not as strong as it was prior to her stroke in 2002. (10/07 Hrg. Tr. 1054, 1057-1059).

- In the September 2011 hearing, she recalled that (during the relevant time period) she was not able to stand in one place, could walk for less than a block, and sit for approximately 30 to 60 minutes before having to move. (9/11 Hrg. Tr. 1485).

---

[4]     Hardy's attorney indicated at the September 2011 hearing that Hardy had suffered a serious accident after the 2007 hearing, which had further impacted her memory. (Tr. 1468-1469). In light thereof, the ALJ indicated she would refer in part to Hardy's prior testimony in 2007. (Tr. 1490). In her November 21, 2011 decision, the ALJ references Hardy's testimony during both the 2007 and 2011 hearings. (Tr. 1108). For this reason, this Opinion summarizes pertinent testimony from both hearings.

8

- In the 2007 hearing, her most significant problems were her back pain and inability to concentrate. (10/07 Hrg. Tr. 1060).  On an average day, her pain level is at a seven, even with medication. (10/07 Hrg. Tr. 1060). Because of her psychological impairments, she is easily distracted and has difficulty being around other people. (10/07 Hrg. Tr. 1062-1065).

- In terms of her daily activities, she helps get her daughter off to school, does the dishes, and drives. (10/07 Hrg. Tr. 1052; 9/11 Hrg. Tr. 1488).  Her son helps her a great deal on daily basis. (10/07 Hrg. Tr. 1066). She generally tries "to help as much as I possibly can, but I'm slower than I used to be." (10/07 Hrg. Tr. 1052).

During the September 13, 2011 hearing, the ALJ posed three hypotheticals to the VE.

The first hypothetical was as follows:

> The first hypothetical concerns an individual of the claimant's age, education, and past relevant work experience.  In the first hypothetical the individual can lift and carry 10 pounds frequently and 20 pounds occasionally, could sit, stand or walk six to eight hours each during the course of an eight hour day.  Could never climb stairs and ramps.  This individual has to avoid concentrated exposure to fumes, odors, dust, gases and poorly ventilated areas.  In this first hypothetical, I'm limiting this individual to low stress tasks, I define low stress tasks as precluding high production quotas such as piece work or assembly line work, strict time requirements, arbitration, negotiation, confrontation, directing the work of others or being responsible for the safety of others. I'm furthermore going to limit this individual to tasks with superficial interaction with supervisors, coworkers and the public.

(9/11 Hrg. Tr. 1492-1493).  In response, the VE testified such a hypothetical claimant could not return to past relevant work as a nurse assistant and would not have any transferable skills. (9/11 Hrg. Tr. 1493).  The VE further testified such a hypothetical claimant could work as a cashier II, housekeeping cleaner, or commercial cleaner.  (9/11 Hrg. Tr. 1493-94).

The ALJ then explained that the second hypothetical claimant could lift and carry five pounds frequently and ten pounds occasionally, and could sit for six to eight hours.  (9/11 Hrg. Tr. 1494).   This individual could never climb ladders, ropes, scaffolds, stairs and ramps; must avoid fumes, odors, dust, gases and poorly ventilated areas; is limited to low stress tasks and

9

superficial interaction with others. (9/11 Hrg. Tr. 1495).  Once again, the VE stated  such an

individual could not return to past relevant work as a nurse assistant and would have no

transferable skills, but could work as a cashier II or production worker.  (9/11 Hrg. Tr. 1495-

1496).

Finally, the ALJ added the further limitation to the second hypothetical that the jobs

should be simple and routine and could be learned in 30 days or less. (9/11 Hrg. Tr. 1496).  The

VE testified such an individual could work as a cashier II or production worker. (9/11 Hrg. Tr.

1497).  The ALJ then added the further limitation that, as a result of symptoms, the claimant

would be off task 20 percent of the time or more, or would miss two or more days of work per

month. (9/11 Hrg. Tr. 1497).  The VE testified there would be no jobs for such an individual.

(9/11 Hrg. Tr. 1497).

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments,

that can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[5]

---

[5]  The entire process entails a five-step analysis as follows: First, the claimant must not be
engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe
impairment."  A "severe impairment" is one which "significantly limits ... physical or mental
ability to do basic work activities."  Third, if the claimant is not performing substantial gainful
activity, has a severe impairment that is expected to last for at least twelve months, and the
impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404,
Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work
experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's
impairment does not prevent the performance of past relevant work, the claimant is not

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Hardy was insured on her alleged disability onset date, March 1, 2002, and remained insured through December 31, 2006.  (Tr. 1101).  Therefore, in order to be entitled to POD and DIB, Hardy must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988).

## IV.  Summary of Commissioner's Decision

The ALJ found Hardy established medically determinable, severe impairments due to "degenerative disc disease of the cervical, thoracic and lumbar spine, herniated C5-C6 disc, chronic obstructive pulmonary disease (COPD), status post remote appearing lacunar infarct of the right basal ganglia, depressive disorder, not otherwise specified, bipolar disorder, mixed, chronic pain disorder associated with psychological factors and a medical condition and history of opiate and benzodiazepine dependence." (Tr. 1103).  However, the ALJ found her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Hardy was found incapable of performing her past work activities, but was determined to have a Residual Functional Capacity ("RFC") for light work with certain limitations. (Tr. 1107).  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Hardy was not disabled.

---

disabled.  For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a mere scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.

12

Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

Hardy claims the ALJ erred by failing to (1) assess and accord proper weight to the opinions of treating physician Gemma regarding her physical limitations; (2) include any limitations in the use of her left upper extremity; and (3) properly evaluate her credibility. (Doc. No. 15 at 16-24).

### *Treating Physician*

Hardy argues the ALJ failed to evaluate the opinions of Dr. Gemma in any fashion, despite acknowledging that she is one of Hardy's treating physicians.  She argues Dr. Gemma limited

Hardy to a less than sedentary level of exertion and that, had this opinion been given any weight, "a finding of disability would have necessarily followed, at the very least as of Plaintiff's 50th birthday." (Doc. No. 15 at 19).  Hardy further argues that, even prior to her 50th birthday, Dr. Gemma provides an RFC for less than full range of sedentary work and the ALJ erred when she failed to evaluate or accord any weight to this opinion.

The Commissioner argues the ALJ did not err in considering Dr. Gemma's opinions because they were "patently deficient."  He notes Dr. Gemma is not a specialist and, further, that her office notes simply recite Hardy's statements of pain without providing objective medical findings.  Moreover, the Commissioner argues Dr. Gemma's RFC assessment is dated two months after Hardy's DLI and fails to indicate it is retrospective.  Finally, viewing the ALJ's decision as a whole, the Commissioner argues it is clear the ALJ implicitly rejected Dr. Gemma's opinions. (Doc. No. 16 at 15-17).

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2).  "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Indeed, "[t]reating

14

source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[6]

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

---

[6]  Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

In some circumstances, however, a violation of the "good reasons" rule may be considered "harmless error." The Sixth Circuit has found these circumstances present where (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d) - the provision of the procedural safeguard of reasons - even though she has not complied with the terms of the regulation." *Wilson*, 378 F.3d at 547. *See also Cole v. Astrue,* 661 F.3d 931, 940 (6th Cir. 2011); *Nelson v. Comm'r of Soc. Sec.*, 195 Fed. Appx. 462, 470-471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed. Appx. 456, 464 (6th Cir. 2005). In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments. *See Nelson*, 195 Fed. Appx. at 470-471 (6th Cir. 2006); *Hall,* 148 Fed. Appx. at 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec*., 375 Fed. Appx. 543, 551 (6th Cir. 2010). In other words, "[i]f the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Friend*, 375 Fed. Appx. at 551.

Here, the record reflects Dr. Gemma began treating Hardy in September 2006, just three months prior to her DLI, December 31, 2006. (Tr. 966-977). It appears Hardy saw Dr. Gemma at least one more time, on December 21, 2006. (Tr. 970). Dr. Gemma authored Hardy's physical RFC assessment two months later, in February 2007, and continued to treat Gemma until at least 2008. (Tr. 1004-1005). The Commissioner does not dispute that she is a treating physician.

16

As set forth above, Dr. Gemma limited Hardy to lifting and carrying five pounds occasionally, and standing and walking for four hours per eight hour workday. (Tr. 933).  She does not indicate how many hours Hardy could sit in an eight hour work day, although she does state Hardy's legs would need to be elevated at chair level and she would need additional rest periods throughout the day.  (Tr. 933-34).  She stated Hardy could occasionally kneel and crawl, but rarely or never climb, balance, stoop, crouch, reach, push, pull, or engage in either fine or gross manipulation. (Tr. 934).  Although spaces are provided throughout the form to explain the medical findings supporting her assessments, Dr. Gemma does not indicate any such findings or otherwise explain the medical basis for her opinions.  (Tr. 933-934).

The ALJ formulated the RFC as follows:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she cannot climb ladders, ropes, or scaffolds and can no more than occasionally climb ramps or stairs; the claimant must avoid exposure to fumes, odors, dusts, gases and poorly ventilated areas; she can perform low-stress tasks that involve no more than superficial interaction with supervisors, co-workers and the public; she is precluded from tasks involving high production quotas, strict time requirements, arbitration, negotiation, confrontation, direction of the work of others or responsibility for the safety of others.

(Tr. 1107). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).  As the Commissioner has explained, "[s]ince frequent lifting or carrying requires being on ones feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.  Sitting may occur

17

intermittently during the remaining time." SSR 83-10, 1983 WL 31251 at * 6.

In her decision, the ALJ refers briefly to Dr. Gemma's decision not to prescribe Hardy further narcotics but does not address Dr. Gemma's physical capacity assessment or discuss how much weight, if any, she gave Dr. Gemma's opinions. (Tr. 1110-1111).   However, viewing her decision as a whole, the Court finds the ALJ's evaluation of Hardy's physical impairments indirectly rejects both the supportability of Dr. Gemma's opinions and the consistency of those opinions with the evidence of record.

The ALJ thoroughly discussed the medical evidence regarding Hardy's back and neck impairments, as well as other physicians' assessments of Hardy's physical limitations.  While she noted evidence of disc herniations in Hardy's cervical spine, the ALJ emphasized that MRIs of her lumbar spine in 2006 found only minimal degenerative changes with no bony or ligamentous abnormality.  (Tr. 1108).  Moreover, she cited several EMG and nerve conduction studies of Hardy's upper and lower extremities which were either normal or showed only mild neuropathy. Based on these studies, the ALJ concluded the medical record failed to show any neurological loss or compromise associated with Hardy's spinal impairments, a finding not contested by Hardy herein.  (Tr. 1109).  The ALJ further noted that, while Hardy pursued treatment with numerous providers, the record reflects a conservative course of treatment with no evidence that surgical intervention was considered despite her ongoing reports of pain.  (Tr. 1109).

The ALJ also emphasized improvements in Hardy's physical functioning after completing three weeks of treatment under the care of Dr. Covington at the Cleveland Clinic's pain rehabilitation program in 2005.  Specifically, she noted Hardy had increased her bilateral shoulder and grip strength, and reported the ability to perform bicep curls with five pounds (15 reps), leg-

18

press 88 pounds (15 reps), and speed walk at 3.2 mph. (Tr. 1110). Moreover, the ALJ found it significant that Hardy reported the ability to perform a variety of functional tasks without an increase in pain after undergoing occupational therapy through the pain rehabilitation program. These tasks included taking out the trash, carrying 15 pounds of groceries up and down four sets of 15 stairs, pushing a 100 pound grocery cart for 1000 feet, and carrying a full laundry basket weighing at least 12 pounds while walking 50 feet. (Tr. 1114-1115). Moreover, the ALJ discussed and accorded some weight to the opinions of state agency physician Dr. Holbrook regarding Hardy's physical impairments. (Tr. 1114). Specifically, she found that Dr. Holbrook's conclusions that Hardy could sit for six hours in an eight hour work day and stand/walk for eight hours were consistent with the record evidence. (Tr. 1114). [7]

The above evidence regarding Hardy's physical impairments and improvement after undergoing treatment at the pain rehabilitation program conflicts with Dr. Gemma's restrictive physical limitations. By thoroughly analyzing and accepting this evidence, the ALJ adequately addressed Dr. Gemma's opinions by indirectly attacking the consistency of those opinions with the other record evidence and their supportability.

Moreover, the ALJ's evaluation of Hardy's credibility further undermines both the supportability and consistency of Dr. Gemma's opinion. As noted above, in her physical capacity assessment, Dr. Gemma failed to indicate any medical findings that supported her opinions regarding Hardy's limitations. (Tr. 933-934). Rather, Dr. Gemma's treatment notes from the relevant time period appear to be based principally on Hardy's subjective statements regarding

---

[7]     The ALJ rejected Dr. Holbrook's opinions to the extent they attributed exertional and manipulative limitations to impingement syndrome of the left shoulder. As discussed more fully *infra*, the Court finds the ALJ did not err in doing so.

19

the intensity and frequency of her pain. (Tr. 966-977).

However, the ALJ seriously questioned Hardy's credibility in light of her well-documented "drug seeking behavior." (Tr. 1110).  She recounted numerous medical records setting out Hardy's pattern of obtaining narcotic pain medication from ERs, "pharmacy hopping," and seeking prescriptions from multiple physicians. (Tr. 1110-1111).  The ALJ also noted evidence that Hardy exaggerated her pain symptoms, including a finding that she exhibited four out of five positive Waddell's signs when assessed for the Cleveland Clinic's pain rehabilitation program. (Tr. 1109).  The ALJ also found Hardy's reports of her declining daily functioning in disability applications to be inconsistent with her reports to treatment providers. (Tr. 1114).  In light of the above, the ALJ found Hardy's statements regarding the intensity, persistence, and limiting effects of her pain symptoms were simply not credible.

Hardy argues the ALJ failed to properly assess her credibility.  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96-7p, Purpose section; *see also Felisky v. Bowen,* 35 F.2d 1027, 1034 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").  To determine credibility, the ALJ must look to medical evidence, statements by the

claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* SSR 96–7p, Purpose. Beyond medical evidence, there are seven factors that the ALJ should consider.[8] The ALJ need not analyze all seven factors, but should show that she considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*, 406 F.Supp.2d 1038, 1046 (E.D. Wis. 2005).

Hardy argues the ALJ erred because she did not specifically address the seven factors set forth in SSR 96-7p. The Court disagrees. In determining Hardy lacked credibility, the ALJ considered virtually all of the factors listed in SSR 96-7p, including (1) Hardy's testimony regarding her daily activities and the conflict between that testimony and her self-reporting to treatment providers; (2) Hardy's testimony and medical records regarding her pain symptoms; (3) the medications prescribed to control Hardy's pain and the lack of any evidence in the medical record of side effects from those medications; and, (4) the improvement Hardy experienced after occupational and physical therapy, coupled with Hardy's failure to further pursue such therapy despite doctors' recommendations that she do so. (Tr. 1109-1115). The ALJ provided sufficiently specific reasons for her credibility determination and supported those reasons with specific

---

[8]     The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96–7p, Introduction; *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 732-733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

evidence in the record. Hardy's arguments to the contrary are without merit.

Thus, although the ALJ did not specifically discuss Dr. Gemma's opinions regarding Hardy's physical limitations, her discussion of the other medical evidence related to Hardy's physical impairments, and Hardy's lack of credibility, implicitly rejects Dr. Gemma's opinions as not supported by, and inconsistent with, the rest of the record. Accordingly, the Court finds the ALJ "met the goal of § 1527(d) – the provision of the procedural safeguard of reasons– even though she has not complied with the terms of the regulation." *Wilson*, 378 F.3d at 547. *See also Hall*, 148 Fed. Appx. at 462; *Nelson*, 195 Fed. Appx. at 472.

### *Failure to Include Limitations Regarding Use of Left Upper Extremity*

Hardy next argues the ALJ erred by failing to account for state agency physician Holbrook's limitations relating to her left upper extremity. After conducting a records review, Dr. Holbrook, in February 2005, concluded Hardy could lift no more than 10 pounds occasionally and could engage in no overhead reaching or lifting with the left arm. (Tr. 416). Hardy argues Dr. Holbrook's left arm limitations would have essentially placed her at a sedentary level of exertion, which would have led to a finding of disability as of age 50. (Doc. No. 15 at 20).

The ALJ rejected Dr. Holbrook's opinions to the extent they were based on Hardy's left arm limitations as follows:

> Dr. Holbrook's opinions as to the claimant's exertional and postural limitations are generally consistent with the evidence as a whole. However, as Dr. Holbrook attributed both exertional and manipulative limitations to impingement syndrome of the claimant's left shoulder, his conclusions were given less than full weight. As discussed more fully above, there is insufficient evidence to conclude that the claimant's impingement syndrome of the left shoulder remained a severe, medically determinable impairment for a period of twelve consecutive months. The claimant was diagnosed with this impairment by only one physician, who treated her for only a period of two months. No other physician noted symptoms or clinical signs consistent

with impingement syndrome.

(Tr. 1114).  Earlier in her decision, the ALJ noted that one physician (Dr. Taliwal) had diagnosed left shoulder impingement based on Hardy's limited abduction and internal rotation of the left shoulder during an examination in October 2004.  (Tr. 1104).  However, the ALJ found that left shoulder impingement was not established by the medical evidence because (1) no other treating or examining physician observed these findings, and (2) Hardy demonstrated normal range of motion during a July 2005 physical therapy evaluation. (Tr. 1104).

Hardy does not contest the ALJ's determination that her left shoulder impingement was non-severe.  Rather, she argues the ALJ erred because she failed to acknowledge that Dr. Holbrook's opinions on this issue were due, in part, to her cervical stenosis, which is documented by the medical evidence.  Because these limitations "may stem from the recognized severe impairments in Ms. Hardy's cervical spine," Hardy argues the ALJ's decision should be reversed and remanded. (Doc. No. 15 at 21).

The Commissioner argues that, regardless of whether Dr. Holbrook based his opinions on a diagnosis of cervical stenosis or left shoulder impingement, the medical record reflects (and the ALJ correctly found) that Hardy successfully rehabilitated and demonstrated full function of her upper extremities by the end of 2005. (Tr. 1110, 1114).  Thus, he argues, the ALJ correctly formulated her RFC based on substantial evidence in the record.

The Court agrees.  The ALJ noted that, while Hardy reported weakness of her left upper extremities in 2002, this "was attributed to the claimant's questionable motivation, rather than neurological deficit and differential diagnoses of conversion disorder and malingering [were] included in the assessment of the neurologist." (Tr. 1109).  Moreover, the ALJ found Hardy

23

demonstrated a normal range of motion of the upper extremities during a July 2005 physical therapy evaluation and was able, after several weeks of therapy in late 2005, to increase her bilateral shoulder strength and ability to perform a variety of functional tasks without increased pain. (Tr. 1104, 1110, 1114). The record does reflect Hardy reported severe left arm pain in April 2006 and was found to have "strikingly" increased deep tendon reflexes on her upper extremities. (Tr. 702). Two months later, Dr. Yonan noted Hardy had "fair and good range of motion" with increased pain, but noted she had "major psychological factors affecting her pain" and recommended non-narcotic therapy and physical therapy.[9] (Tr. 754). Dr. Gemma's treatment notes from September through December 2006 do not reflect that Hardy complained of pain in her left upper extremities. (Tr. 966-977).

As the Sixth Circuit has noted, an RFC "is an assessment of what [a claimant] can and cannot do, not what she does and does not suffer from." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002). *See also Brasseur v. Comm'r of Soc. Sec.*, 2009 WL 1121625 at * 2 (E. D. Mich. April 23, 2009) (finding that "the hallmark of an RFC determination is its focus on function"). Here, the ALJ discussed the medical evidence regarding Hardy's left upper extremities and determined, based on that evidence, that Hardy had regained the strength and functional capacity to perform light work as set forth in the RFC. The Court finds the ALJ's determination on this issue is supported by substantial evidence in the record.

### *Credibility*

Lastly, Hardy argues the ALJ failed to properly assess her credibility and complaints of

---

[9]     Dr. Yonan also noted good range of motion in Hardy's neck with only diffuse tenderness. (Tr. 754).

pain. She argues the ALJ failed to address the seven factors set forth in SSR 96-7p, particularly with regard to her repeated complaints of neck pain and arm limitations. (Doc. No. 15 at 22-23). The Commissioner argues the ALJ considered all the necessary factors in evaluating Hardy's pain complaints and correctly concluded, based on her "extreme drug-seeking behavior and minimal examination and imaging findings," that Hardy was simply not credible. (Doc. No. 16 at 19-20).

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability. *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment. Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms." SSR 96-7p. Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *See Felisky,* 35 F.3d at 1038-39.

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. *Id*. As discussed *supra*, credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet*, 823 F.2d at 920. However, the ALJ must provide specific reasons for the finding on credibility which are supported by evidence in the case record. *See* SSR 96-7p, Purpose section;

*Felisky*, 35 F.3d at 1034.  In addition to considering the medical evidence of record, the ALJ should consider the seven factors discussed *supra* in analyzing a claimant's credibility. *See* SSR 96-7p, Introduction.

Here, the ALJ accepted that Hardy suffered from various severe impairments, including degenerative disc disease, herniated C5-C6 discs, COPD, and status post remote appearing lacunar infarct of the right basal ganglia. (Tr. 1103).  She found the impairments caused significant limitation in Hardy's ability to perform basic work activities. (Tr. 1103).  However, the ALJ dismissed Hardy's statements concerning the intensity, persistence, and limiting effects of the symptoms as not credible to the extent they were inconsistent with the ALJ's RFC assessment. (Tr. 1108).

The Court finds the ALJ did not improperly assess Hardy's credibility.  She fully considered the medical evidence, including evidence regarding Hardy's complaints of neck pain and arm limitations.  (Tr. 1108-1109).  Moreover, as discussed *supra*, the ALJ considered virtually all of the factors set forth in SSR 96-7p, including Hardy's testimony regarding her daily activities; the location, frequency, and intensity of her pain; the medications prescribed to control her pain and the lack of any evidence of side effects; and, the improvement Hardy experienced after occupational and physical therapy.  (Tr. 1109-1115).  She questioned Hardy's credibility, however, in light of considerable medical evidence of Hardy's  "questionable motivation" and drug-seeking behavior.  (Tr. 1109-1111).  She also noted the fact that Hardy scored 4 out of 5 positive Waddell's signs. (Tr. 1109).

Based on the above, the Court finds the ALJ provided sufficiently specific reasons for her credibility determinations and supported those reasons with reference to specific evidence in the

record.  Hardy's arguments to the contrary are without merit.

### VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner is supported by substantial evidence.  Accordingly, the decision of the Commissioner is AFFIRMED and judgment is entered in favor of the defendant.

IT IS SO ORDERED.


<u>/s/ Greg White</u>
U.S. Magistrate Judge

Date: May 2, 2013